## GEO. H. LEE CO. v. PRATT FOOD CO.
### No. 5243.

Circuit Court of Appeals, Third Circuit.
June 27, 1934.

T. Hart Anderson, of New York City (Louis Necho, of Philadelphia, Pa., Munn, Anderson, Stanley, Foster & Liddy, Orson D. Munn, Sylvester J. Liddy, and Daniel H. Kane, all of New York City, of counsel), for appellant.

Augustus B. Stoughton, of Philadelphia, Pa. (Edw. S. W. Farnum, Jr., Henry J. Rebman, and James Gay Gordon, all of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and JOHNSON, District Judge.

BUFFINGTON, Circuit Judge.

In this case the Geo. H. Lee Company, the owner of patent No. 1,778,264, granted October 14, 1930, to George H. Lee for an insoluble capsule, charged the Pratt Food Company with infringement thereof. On hearing, the court below dismissed the bill, whereupon plaintiff took this appeal.

The patent concerns the expulsion of tapeworms from fowls. Though not generally known, tapeworms find lodgment in that part of the intestines of chickens and other fowls which lies below the gizzard. Poisonous medicines which would serve to expel worms when delivered to, and absorbed in full strength by, them, were well known, but, in spite of this, the mischief—which was a serious one and well known to poultry raisers—still continued to exist. Various attempts were made to overcome it. For example, the poisonous medicine was mixed in troughs with chicken food, but it was found that the healthy chickens, which had no worms and no need of the medicine, consumed the major portion of the food, and the unhealthy

chickens, which had worms, did not get the food. In this treatment it was found the medicine was diluted before it reached the post-gizzard intestines, and, moreover, the absorption of the medicine by the ante-gizzard intestines injuriously affected the latter, and some resulted in injuries thereto which were more harmful than worms. Attempts were also made to overcome this objectionable feature by introducing the worm medicine through a catheter, but, after trial, such method was abandoned.

In view of the proofs in the case, we think the state of the art was accurately described in the specification of the patent as follows: "Medicines for destroying intestinal worms are of such a nature that they are dangerous to poultry when absorbed into the system through that part of the intestinal tract which is between the throat and gizzard. Medicines of this type which contain poisonous compounds are usually administered into the crop either in liquid form or in the form of capsules, tablets or pills and such medicine is very materially absorbed by the mucus membranes of the crop, the throat and the glandular stomach of the fowl. In view of the poisonous nature of the medicines which is required to destroy the worms, the fowls are frequently made quite sick and sometimes results in the death, especially if the condition caused by the worms is complicated with other diseases."

The remedy and the improvement the patentee proposed to afford it is likewise stated in the specification, viz.: "An object of the invention is to provide a container in the form of a capsule or a coating for medicines of such character which is insoluble in the fluids associated with the throat, crop and glandular stomach of the fowls, but which may be broken in the gizzard due to the hard materials therein and the strong muscular action for breaking up hard particles so that the medicines may be directly applied to those parts which are infested with worms."

Protection for the patentee's capsule was granted in the single claim, which reads as follows: "A capsule for treating poultry comprising a medicament and a protective covering therefor, said protective covering being unaffected by body heat and insoluble in all the fluids of the body but capable of being fractured by mechanical action in the gizzard, so that the medicament can be released only by the fracture of the protective covering in the gizzard."

The proofs show that a capsule of such functional capacity was new in the art. It was useful, as is shown by its rapid, extensive and growing use. In the four years following the issue of the patent the sales grew from $28.93 in 1927 to $194,681.54 in 1930.

A disinterested witness, who had been in the poultry business for nine years, and "had plenty of trouble with my poultry becoming infested with worms in the intestines," testified he used "the old-fashioned flock treatment and graduated from that to Lee's 'Gizzard' capsules. * * * The flock treatment is not at all satisfactory, because a sick bird is a bird that has no appetite and won't eat as much as a healthy bird will. The result is that the birds that do not need the medicine are getting an overdose and the birds that do need it don't get a sufficient quantity of it to do them any good. * * * I use Lee's 'Gizzard' capsules, and I began using them three years ago. They are as near positive as anything I found. I would say 100 per cent." Indeed, the defendant, by copying the Lee capsule, bears testimony to its worth. When signal, practical, and unique efficiency of the device and its elimination of a highly objectional feature of such a widespread and important industry as the raising of fowls is shown, we are convinced that the plaintiff's patent involved invention.

While we hold the plaintiff's patent was valid and infringed, and in that regard the decree below must be vacated, we find no error in the court's decree in respect to unfair competition and violation of trade-mark. The record will therefore be remanded, with instructions to reform its decree by holding the plaintiff's patent valid and infringed with liability to account, the costs in this and the court below to be divided between the parties.